Case No. 19-1601

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

HAROLD STONE and JOHN WOESTMAN,
for themselves and others similarly-situated, and UNITED STEEL,
PAPER AND FORESTRY, RUBBER, MANUFACTURING,
ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,
AFL-CIO CLC,

Plaintiffs-Appellees

v.

SIGNODE INDUSTRIAL GROUP LLC and ILLINOIS TOOL WORKS INC.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:17-cv-05360

_____

**RETIREES' OPPOSITION TO MOTION TO STAY DISTRICT COURT
INJUNCTION (R. 64) ORDERING DEFENDANTS TO RESTORE
RETIREMENT HEALTHCARE**

_____

Stuart M. Israel
John G. Adam
Legghio & Israel, P.C.
306 South Washington, Suite 600
Royal Oak, MI 48067
248-398-5900
israel@legghioisrael.com
jga@legghioisrael.com

Attorneys for Plaintiffs-Appellees

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

PARTIES, ABBREVIATIONS, AND EXHIBITS ..................................................... v

SUMMARY OF PROCEEDINGS ............................................................................. 1

SUMMARY OF ARGUMENT ................................................................................. 2

ARGUMENT ............................................................................................................. 4

    I.      Staying a Permanent Injunction Pending Appeal is "Extraordinary" ................... 4

    II.     The District Court Correctly Held That the Collectively-Bargained Promises—That Healthcare (1) Continues "Notwithstanding" CBA "Expiration" and (2) "Shall Not" be "Terminated or Reduced" While a Retiree or Surviving Spouse Receives Pension, *i.e.*, for Life—Vest Retirement Healthcare ....................................................................................... 4

        A.     The contract terms vest retirement healthcare ........................................... 5

        B.     Federal precedent and steel industry practice prove vested retirement healthcare ..................................................................................... 7

        C.     Company practice proves vested retirement healthcare ............................. 8

    III.    The Company's Untenable General Duration Clause Argument .......................... 9

    IV.    A Stay Would Substantially Harm Retirees ..................................................... 11

    V.     The Public Interest Favors Enforcement of Collectively-bargained Healthcare Promises and Retirees' ERISA Rights ............................................. 15

    VI.    The Company Has "Unclean Hands" ................................................................. 15

CONCLUSION ....................................................................................................... 17

DESIGNATION OF DISTRICT COURT DOCUMENTS ........................................... i

# TABLE OF AUTHORITIES

## CASES

*ABF Freight System v. NLRB*, 510 U.S. 317 (1994).....................................................15

*Arthur v. Allen*, 574 F.Supp.2d 1252 (S.D. Ala. 2008)...............................................17

*Bland v. Fiatallis*, 401 F.3d 779 (7th Cir. 2005)...........................................................6

*Blum v. Caldwell*, 446 U.S. 1311 (1980) .....................................................................13

*Bombard v. Fort Wayne Newspapers*, 92 F.3d 560 (7th Cir. 1996) ...........................5

*Bower v. Bunker Hill*, 725 F.2d 1221 (9th Cir. 1984) ..................................................9

*Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269 (1877) ...............................................2

*Cherry v. Auburn Gear*, 441 F.3d 476 (7th Cir. 2006) ................................................6

*City of Pontiac Retired Employees Ass'n. v. Schimmel*, 751 F.3d 427 (6th Cir. 2014) (*en banc*) ............................................................................................................................12

*CNH Industrial v. Reese*, 138 S.Ct. 761 (2018)...............................................2, 5, 7, 11

*Crown Cork v. IAM*, 501 F.3d 912 (8th Cir. 2007).......................................................6

*Deutsche Bank v. Cornish*, 759 Fed.Appx. 503 (7th Cir. 2019) ..................................4

*Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996) ..........................................12

*Grove v. Johnson Controls*, 694 Fed.Appx. 864 (3rd Cir. 2017) ................................6

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ...................................................................4

*HR Staffing v. Butts*, 2015 WL 3561618 (D.N.J.)........................................................12

*Iron Workers v. SR Industries Corp*., 940 F.2d 665 (7th Cir. 1991)...........................8

*Keffer v. H.K. Porter Co*., 872 F.2d 60 (4th Cir. 1989) .......................................7, 8, 10

*LaForest v. Honeywell,* 2003 WL 23180220 (W.D.N.Y.).............................................12

*Litton Financial Printing Div. v. NLRB*, 501 U.S. 190 (1991) .....................................5

*M&G Polymers v. Tackett*, 135 S.Ct. 926 (2015)..............................................2, 5, 7, 10

*Murphy v. Keystone Steel*, 61 F.3d 560 (7th Cir. 1995).................................................6

*North American Airlines, Inc. v. IBT*, 2005 WL 926969 (S.D.N.Y.) ...........................7

*Rossetto v. Pabst Brewing Co*., 217 F.3d 539 (7th Cir. 2000), *cert. den*. 531 U.S. 1192 (2001) ............................................................................................................. 7, 8

*Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315 (1983) .................................................... 4

*Silverstein v. Penguin Putnam, Inc.*, 2003 WL 21361734 (S.D.N.Y.) ............................ 4, 7, 9, 13

*Steelworkers v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987) ........................................ 11, 12

*Stone v. Signode*, 2019 WL 1375159 (N.D. Ill.) (R. 64) ................................................ 1

*Stone v. Signode*, 2019 WL 2308038 (N.D. Ill.) (R. 83) ................................................ 1

*Stone v. Signode*, 365 F.Supp.3d 957 (N.D. Ill. 2019) (R. 55) ...................................... 1

*Teamsters Local 120 v. Marathon*, 2006 WL 2971667 (D. Minn.) ................................. 15

*UFCW v. Dubuque Packing Co.*, 756 F.2d 66 (8th Cir. 1985) ......................................... 9

*USWA v. Connors Steel Co*., 855 F.2d 1499 (11th Cir. 1988), *cert. den.* 489 U.S. 1096 (1989) ..................................................................................................... 7, 8, 9, 10

*Vallone v. CNA Financial*, 375 F.3d 623 (7th Cir. 2004) ............................................ 6

*Webb v. GAF*, 1995 WL 118178 (N.D.N.Y.) ............................................................. 12

*Wilson v. Gordon*, 822 F.3d 934 (6th Cir. 2016) ....................................................... 12

*Zielinski v. Pabst Brewing Co*., 463 F.3d 615 (7th Cir. 2006) ...................................... 8

**STATUTES**

Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1001 *et seq.* ................. 1, 2, 16

Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1001(b) ....................... 15

Labor-Management Relations Act Section 301, 29 U.S.C. §185 .................................... 15

National Labor Relations Act, 29 U.S.C. §151 *et seq.* ............................................. 15

**RULES**

Federal Rule of Civil Procedure 56 ................................................................. 6

Federal Rule of Evidence 801(d)(2) ................................................................. 8, 9, 11

**OTHER AUTHORITY**

Twain, Mark, *A Connecticut Yankee In King Arthur's Court* (1889) ........................................... 11

## PARTIES, ABBREVIATIONS, AND EXHIBITS

Plaintiffs are retirees from the Riverdale, Illinois plant and class representatives **(1)** Harold Stone and **(2)** John Woestman, and their former union, **(3)** United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers Industrial Union, AFL-CIO-CLC ("**USW**"), collectively the "**retirees**."

Defendants are **(1)** Signode Industrial Group LLC ("**Signode**") and **(2)** Illinois Tool Works Inc. ("**ITW**"), successors to Acme Packaging Corporation ("**Acme**"), collectively the "**company**."

References to the district court record are shown as "**R. __.**"

We refer to the governing collective bargaining agreement—the 2002 Pensioners' and Surviving Spouses' Health Insurance Agreement (R. 36-5)—as the "**Pensioners' CBA**."

The Pensioners' CBA promises healthcare for **(1)** the "184 pensioners" who retired from Riverdale before November 1, 2001, under earlier Pensioners' CBAs, "and their surviving spouses (and their eligible dependents)" and **(2)** Riverdale employees who retired on or after November 1, 2001 under later Pensioners' CBAs, and the retirees' families.  (R. 36-5 at A102-103).

The Pensioners' CBA promises family healthcare **(1)** to each pensioner "so long as" he or she "remains retired" and **(2)** to each pensioner's surviving spouse "so long as" he or she "receives" pension.  (R. 36-5 at A72, ¶6).

To aid the Court, we attach district court rulings (R. 55, 64-65, 83) and related filings (R. 74-75, 80-81, 84).

The attached declaration of former Acme and ITW benefits administrator and Riverdale human resources manager Anthony Kuchta (R. 36-17) is cited as "**Kuchta ¶__.**"

## SUMMARY OF PROCEEDINGS

### 1.

The district court held that the company breached the Pensioners' CBA and violated ERISA by unilaterally ending healthcare on December 31, 2015, damaging the remaining 140 Riverdale retirees and their spouses and surviving spouses. (R. 55; *Stone v. Signode*, 365 F.Supp.3d 957 (N.D. Ill. 2019)).

The district court ordered that the company "as soon as reasonably practicable, restore the *status quo ante*" and reinstate the "healthcare benefits that were in effect before January 1, 2016." (R. 64; *Stone v. Signode*, 2019 WL 1375159 (N.D. Ill.)).

The company has not complied.

### 2.

The company appealed and later asked the district court to stay the March 26, 2019 injunction pending appeal. (R. 71). That was on May 3, 2019, 38 days after a stipulated order reserved damages issues and preserved the retirees' right to enforce the injunction during the company appeal. (R. 64-65; R. 79).

The district court denied the stay. The district court reiterated that the company cannot show likelihood of success on appeal and held that the harm to the retirees from a "stay far outweighs the harm to Defendants from denying the stay." (R. 83, PgID##1197-1198, citation omitted; *Stone v. Signode*, 2019 WL 2308038 (N.D. Ill.)).

### 3.

The district court began a contempt hearing on June 10, 2019, after 76 days of company failure to comply with the injunction. (R. 74-R. 88). As detailed in the retirees' motions (R. 74-75; R. 80-81), the company claimed it will take at least six months to reinstate the healthcare. The contempt hearing, scheduled to continue on June 24 (R. 84; R. 88), has been suspended due to this

Court's June 17 order granting a temporary stay of the injunction.  (R. 92).  We ask this Court to lift the temporary stay.

## SUMMARY OF ARGUMENT

By every pertinent measure, a stay is not justified.

We first show that a stay of a permanent injunction should be granted only under "extraordinary circumstances." (**Argument I**).

We then show that the district court correctly held that the  Pensioners' CBA terms "vest lifetime benefits for retirees"  and their spouses and surviving spouses, satisfying the standards set by *CNH Industrial v. Reese*, 138 S.Ct. 761 (2018), *M&G Polymers USA v. Tackett*, 135 S.Ct. 926 (2015), and Seventh Circuit precedent.  (**Argument IIA**).

We show that the Fourth and Eleventh Circuits hold that *identical* CBA terms—common in steel industry practice—promise lifetime retirement healthcare.  (**Argument IIB**).

We next show that Riverdale practice confirms lifetime retirement healthcare.  For decades before—and 11 years after—the Riverdale plant closed and the Pensioners' CBA ended in August 2004, the company provided the promised healthcare.  The Supreme Court wrote: "There is no surer way to find out what parties meant, than to see what they have done."  See *Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269, 273 (1877).  (**Argument IIC**).

We then refute the company's untenable effort to evade its lifetime healthcare obligations based on the inapposite general duration clause.  (**Argument III**).

We then show the retirees are being substantially harmed and that the public interest is best served by prompt enforcement of the injunction and the retirees' contract and ERISA rights to the promised healthcare.  (**Arguments IV-V**).

Last, we show the company has "unclean hands."  (**Argument VI**).

We conclude, as the district court held, that the company has not met its "extraordinary" burden to justify further delay.  We ask this Court to lift the temporary stay and require the company to—in the district court's words—"as soon as reasonably practicable" meet its responsibility to reinstate the promised lifetime vested family healthcare earned by each of the remaining 140 retirees with decades of industrial labor.

## ARGUMENT

### I.     Staying a Permanent Injunction Pending Appeal is "Extraordinary"

A stay of a permanent injunction should be granted only under "extraordinary circumstances." *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1316 (1983) (citation omitted).

Courts consider four equitable factors: **(1)** whether defendants make a "strong showing" they are "likely to succeed on the merits"; **(2)** whether defendants "will be irreparably injured absent a stay"; **(3)** whether a "stay will substantially injure" plaintiffs; and **(4)** "where the public interest lies." *Deutsche Bank v. Cornish*, 759 Fed.Appx. 503, 506 (7th Cir. 2019), quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

Defendants' failure to satisfy any one factor may bar a stay.  *Ruckelshaus*, 463 U.S. at 1316-1317 (likelihood of appellate success need not be considered if the "applicant fails to show irreparable injury from denial of the stay").

We show ahead that the company cannot meet its "extraordinary" burden.

### II.     The District Court Correctly Held That the Collectively-Bargained Promises—That Healthcare (1) Continues "Notwithstanding" CBA "Expiration" and (2) "Shall Not" be "Terminated or Reduced" While a Retiree or Surviving Spouse Receives Pension, *i.e.*, for Life—Vest Retirement Healthcare

The district court's well-grounded permanent injunction should not be stayed merely because the company is "displeased." *Silverstein v. Penguin Putnam, Inc.*, 2003 WL 21361734 at *1 (S.D.N.Y.) (denying stay of an injunction "entered after cross motions for summary judgment" where "defendant is simply displeased with the result").

We show that the district court correctly held that Pensioners' CBA ¶6 promises vested lifetime healthcare.  (**Section A**).  We then show alternative grounds supporting the district court: federal precedent and industry practice (**Section B**) and decades of Riverdale plant performance and practice (**Section C**).  See *Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir.

1996) (Seventh Circuit may affirm on a "ground other than that relied upon by the district court" if the "alternative basis finds adequate support in the record").

We show in Arguments A, B, and C that, as the district court found, the company is not likely to succeed on appeal.

### A.     The contract terms vest retirement healthcare

Vesting can be proved with "explicit terms, implied terms, or industry practice" showing that retirement healthcare is to "continue after the agreement's expiration."  *CNH Industrial v. Reese*, 138 S.Ct. 761, 765 (2018) and *M&G Polymers v. Tackett*, 135 S.Ct. 926, 937 (2015).

### 1.

Pensioners' CBA ¶6—titled "Continuation of Coverage"—has two explicit durational promises.  Paragraph 6 reads in full (R. 36-5, PgID#712):

> Any Pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by the Program established by this Agreement shall not have such coverage terminated or reduced (except as provided in this Program) so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of this Agreement, except as the Company and the Union may agree otherwise.

In *Tackett* terms, 135 S.Ct. at 937, ¶6 explicitly promises retiree healthcare that continues "after the agreement's expiration."  In *Reese* terms, 138 S.Ct. at 766, ¶6 shows the "parties meant to vest" healthcare for the duration of pension, *i.e.*, for life.

In *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991) terms, ¶6 shows that CBA expiration did not end the healthcare "obligations already fixed under the contract but as yet unsatisfied."

In Seventh Circuit terms, ¶6 promises retirement healthcare that does "not expire when the contract expires."  *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607 (7th Cir. 1993) (*en banc*), *cert. denied* 510 U.S. 909 (1993).

## 2.

The district court correctly held that Pensioners' CBA ¶6 vests retiree healthcare. <u>First</u>, the healthcare continues "notwithstanding the expiration of this Agreement." <u>Second</u>, the healthcare "shall not" be "terminated or reduced" while a retiree "remains retired" or a retiree's surviving spouse "receives" pension, *i.e.*, for life. (R. 55 at 4-8).

During the Rule 56 proceedings, the company unavailingly relied on cases that apply CBA terms which bar vesting—*terms not present* in the Pensioners' CBA. The district court rejected the company's inapposite cases, recognizing that (R. 55 at 6, italics in original):

> contrary to Defendants' argument, the provisions at issue in those cases are different from the termination provision at issue here. The provisions in the Seventh Circuit cases Defendants cite expressly limited the duration of *benefits* to the duration of the *agreement*.

Denying the stay (R. 83, PgID##1197-1198), the district court found that the company still relies on inapposite cases, *i.e.*, (**1**) *Grove v. Johnson Controls*, 694 Fed.Appx. 864, 870 (3rd Cir. 2017) (reservation of rights ("ROR") clause allowed company to end retiree healthcare; "extrinsic evidence" proved "vesting was not intended"); (**2**) *Vallone v. CNA Financial*, 375 F.3d 623, 633 (7th Cir. 2004) (ROR clause allowed company to end retiree healthcare); (**3**) *Crown Cork v. IAM*, 501 F.3d 912, 917 (8th Cir. 2007) (ROR clause allowed company to limit retiree healthcare to the "life of" the CBA); (**4**) *Cherry v. Auburn Gear*, 441 F.3d 476, 482 (7th Cir. 2006) (italics in original; CBA promised retiree healthcare only "*during the period of this agreement*"); and (**5**) *Murphy v. Keystone Steel*, 61 F.3d 560, 565-566 (7th Cir. 1995) (CBA specified that retiree healthcare "will remain in effect" only "during the term of this agreement").

Compare *Bland v. Fiatallis*, 401 F.3d 779, 786-787 (7th Cir. 2005) ("lifetime" language "defeats" company summary judgment motion, noting the healthcare plan had no ROR clause).

In this Court, the company again—for the third time—repeats its rejected arguments and inapposite citations, and so fails to show likely appellate success.  See, *e.g.*, *Silverstein*, 2003 WL 21361734 at *1 (stay *denied* where defendant "repeats" the "failed"  arguments it "made in its summary judgment motion") and *North American Airlines, Inc. v. IBT*, 2005 WL 926969 (S.D.N.Y.) (citations omitted; stay *denied* because "repetition of arguments previously considered and rejected cannot" show likely appellate success).

———————————————

We next summarize *alternative* grounds for this Court to deny the stay on the merits—discussed in our district court briefs (R. 36, PgID##593-596; R. 43, PgID##896-899; R. 50, PgID##929-932) and highlighted in our opposition to the stay in the district court (R. 79, PgID##1148-1150)—grounds *ignored* by the company in this Court.

### B.   Federal precedent and steel industry practice prove vested retirement healthcare

Industry practice can prove vesting.  See **(1)** *Reese*, 138 S.Ct. at 765 (retiree healthcare vesting may be shown by "industry practice"); **(2)** *Tackett*, 135 S.Ct. at 935 ("known customs or usages in a particular industry" shown by "affirmative evidentiary support in a given case" may prove retiree healthcare vesting); and **(3)** *Rossetto v. Pabst Brewing Co*., 217 F.3d 539, 546 (7th Cir. 2000), *cert. denied* 531 U.S. 1192 (2001) (brewing industry practice proved latent ambiguity regarding retiree healthcare vesting in seemingly-unambiguous CBA).

Here, industry practice is proved by federal precedent, showing that the language used in the Pensioners' CBA is "basic steel" industry language which promises vested lifetime retiree healthcare.  The definitive "basic steel" retiree healthcare cases are *USWA v. Connors Steel Co*., 855 F.2d 1499, 1504, 1508 (11th Cir. 1988), *cert. denied* 489 U.S. 1096 (1989) and *Keffer v. H.K. Porter Co*., 872 F.2d 60, 62-64 (4th Cir. 1989).

*Connors Steel* and *H.K. Porter* enforced "basic steel" industry CBA terms *identical* to those governing the Riverdale retirees.  The Fourth and Eleventh Circuits held that these CBA terms unambiguously vest healthcare.  The Seventh Circuit—in *Iron Workers v. SR Industries Corp*., 940 F.2d 665 at *4 (1991) (emphasis added)—cites *Connors Steel* and *H.K. Porter* as enforcing CBAs that "*specifically* provided that the employer was *obligated* to continue making benefit contributions *after* the agreement expired."

Here, the company *knowingly* adopted the specific "basic steel" retiree healthcare vesting language, as proved by the undisputed testimony, discussed next, of *company* manager Anthony Kuchta.  (R. 36-17, Kuchta ¶¶3, 5-10).

### C.    Company practice proves vested retirement healthcare

The *undisputed* evidence—of company admissions, performance, and practice—definitively proves vested lifetime healthcare.  See **(1)** *Zielinski v. Pabst Brewing Co*., 463 F.3d 615, 618 (7th Cir. 2006) (finding vested retiree healthcare; how the parties "actually perform" is "persuasive evidence of what the parties understood the contract to require"); **(2)** *Bidlack*, 993 F.2d at 609 (retirees are entitled to "present testimony and documents" to resolve ambiguity about healthcare vesting); and **(3)** *Rossetto*, 217 F.3d at 547 (retirees are entitled to present extrinsic evidence to show and resolve "a patent or a latent ambiguity" about healthcare vesting).

Here, all the evidence proves vesting.

__First__, company manager and negotiator Anthony Kuchta testified that for decades before the Riverdale plant closed in 2004, the company provided *lifetime* retiree healthcare accompanying *lifetime* pensions.  Kuchta testified that the company assured retiring Riverdale employees (making FRE 801(d)(2) admissions) that when the employees became pensioners they and their spouses were entitled to *lifetime* healthcare.  (Kuchta ¶¶4-14, 16).

8

**Second**, in 2004, before the plant closed, company official Kuchta, in an emailed FRE 801(d)(2) admission to USW, wrote, under Pensioners' CBA ¶6, that employees already retired, *and* those who would retire before the last CBA expired, were entitled to—and "earned"—"retiree coverage" which "*shall not terminate*." (Kuchta ¶¶6-13, emphasis added).

**Third**, the company kept its promises for more than a decade *after* it closed the Riverdale plant in 2004—until 2016. This, too, proves vesting. See *e.g.*, **(1)** *Connors Steel*, 855 F.2d at 1502 (continued retiree healthcare *after* plant closing and last CBA expiration *proves* vesting); **(2)** *UFCW v. Dubuque Packing Co.*, 756 F.2d 66, 70 (8th Cir. 1985) (continued retiree healthcare *after* plant closing and last CBA expiration *proves* the parties "implicitly intended to provide lifetime benefits"); and **(3)** *Bower v. Bunker Hill*, 725 F.2d 1221, 1225 (9th Cir. 1984) (citations omitted; continued retiree healthcare *after* CBA expiration is an "objective manifestation" *proving* the employer's lifetime family healthcare obligation to retirees).

———————————

**In sum**, to quote *Silverstein*, the district court "did not misapprehend the law or the facts" **(1)** when it directed the company to restore the *status quo ante* vested retiree healthcare *and* **(2)** when it denied a stay. By *every pertinent measure*—the explicit CBA terms (Argument I), federal precedent and steel industry practice (Argument IIB), and decades of company admissions and performance (Argument IIC)— Pensioners' CBA ¶6 promises lifetime healthcare for Riverdale retirees.

## III.     The Company's Untenable General Duration Clause Argument

The company invokes Pensioners' CBA ¶7. This general clause set a February 29, 2004 CBA expiration date—later extended by the closing agreement to the last day worked by Riverdale shipping and receiving employees, to August 31, 2004. (R. 36-14; R. 50-4).

But CBA expiration is immaterial.  Paragraph 6 *explicitly* promises retirement healthcare "notwithstanding" CBA expiration.

### A.

As discussed in Argument IIA, Pensioners' CBA ¶6 makes two explicit durational promises, *each* making CBA expiration immaterial.  <u>First</u>, ¶6 promises "pensioner" healthcare "notwithstanding" CBA expiration.   <u>Second</u>, ¶6 promises that healthcare "shall not" be "terminated or reduced" while a retiree "remains retired" or the retiree's surviving spouse gets pension, *i.e.*, for life.

As discussed in Argument IIB, the Fourth and Eleventh Circuits held that *identical* terms unambiguously promised vested lifetime healthcare notwithstanding CBA expiration and plant closing.  See *Connors Steel,* 855 F.2d at 1504-1505 (the general duration clause did not supersede the specific promise that retiree healthcare continues "notwithstanding" CBA expiration) and *H.K. Porter*, 872 F. 2d at 63 (the CBA makes it "clear" that retiree healthcare continues "beyond" both CBA expiration and "cessation" of plant operations).

Here, the company made those identical promises in the last CBA—more than a decade after *Connors Steel* and *H.K. Porter*.  Even in bankruptcy the company kept those promises as required, *i.e.*, "notwithstanding" CBA expiration.  The explicit ¶6 makes the general ¶7—and CBA expiration—immaterial to the company's lifetime retiree healthcare obligations.

### B.

Indeed, as a matter of fact and contract jurisprudence, the specific ¶6 overrides the ¶7 general duration clause.  *Generalia specialibus non derogant*—general terms yield to the parties' intentions expressed in specific terms.  See **(1)** *Tackett*, 135 S.Ct. at 937 (general duration clauses do "not preclude the conclusion that the parties intended to vest lifetime benefits for retirees"); **(2)**

*Reese*, 138 S.Ct. at 765-766 (general duration clauses do not supersede "explicit" or "implied" longer durations for retiree healthcare); and **(3)** *Bidlack*, 993 F.2d at 617 (general duration clauses do not control where the CBA promises that retiree healthcare "will not expire when the contract expires").

**C.**

Whether the last CBA expired in 2004—or in 2016, as the company now untenably suggests—expiration is immaterial because ¶6 explicitly ties the duration of retiree healthcare to lifetime pension *regardless of CBA duration*.  Then ¶6 affirms that this healthcare "shall not" be "terminated or reduced" while a retiree "remains retired" or while a retiree's surviving spouse "receives" pension, *i.e.*, *for life*.

In 2004, the company told employees that if they retired before the expiration of the last Pensioners' CBA, ¶6 ensured that "they and their spouses" would get "lifetime" company healthcare.  (R. 36-17, Kuchta ¶¶12-13; R. 50-4, PgID#948).  Now, *post hoc*, the company wants to rewrite both the last CBA and history—contrary to fact and law.

———————————

Mark Twain wrote: "How empty is theory in the presence of fact."  Here the company is all empty self-interested theory, disproved by the undisputed facts manifest in the ¶6 terms, by federal precedent and industry practice, and by the company's 15 years of FRE 801(d)(2) admissions by word and deed.

**IV.    A Stay Would Substantially Harm Retirees**

Retirees deprived of healthcare suffer devastating harm which can only be partially rectified by money damages.  See, *e.g.*, *Steelworkers v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987) (loss of healthcare causes irreparable harm to "retired workers" who "would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's

necessities") and *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996) ("retirees, primarily because of their fixed incomes, are unable to absorb even relatively small increases in their expenses without extreme hardship").

**A.**

Courts routinely uphold *preliminary* (*i.e.*, pre-judgment) injunctions based on the devastating and irreparable harm to retirees caused by "delay in or inability to obtain medical services"—and do so even if "the party against whom the injunction is issued claims that the injunction places significant costs on them." *Wilson v. Gordon*, 822 F.3d 934, 958 (6th Cir. 2016).

See *Pontiac Retired Employees Ass'n. v. Schimmel*, 751 F.3d 427, 432 (6th Cir. 2014) (*en banc*) (reversing preliminary injunction *denial* because the "district court failed to consider that a reduction in health care benefits can cause irreparable harm" to retirees) and *Webb v. GAF*, 1995 WL 118178 at *1 (N.D.N.Y.) (*denying* stay of preliminary injunction restoring collectively-bargained retiree healthcare).

See also *HR Staffing v. Butts*, 2015 WL 3561618 at *2 (D.N.J.) (*denying* stay; staying a preliminary injunction is "extraordinary relief"; the "bar is particularly high" where defendants are "asking the court to negate" a preliminary injunction just granted).

As observed in *LaForest v. Honeywell*, 2003 WL 23180220 at *2 (W.D.N.Y.) (quoting *Textron*, citation omitted):

> Justice Breyer, when a member of the First Circuit Court of Appeals succinctly pointed out that certain general facts are commonly believed or have been held to constitute irreparable harm concerning retirees and reductions in medical benefits, such as: "(1) most retired union members are not rich; (2) most live on fixed incomes; (3) many will get sick and need medical care; (4) medical care is expensive; (5) medical insurance, is therefore, a necessity; (6) some retired workers find it difficult on their own while others pay for it only out of money that they need for other necessities of life...." It is easy to understand that emotional distress is likely to follow termination of retiree medical insurance benefits.

These authorities bar retiree healthcare termination in *preliminary* injunctions. Here, the Court issued a *permanent* injunction—after cross motions were fully briefed and argued. A stay of a fully-litigated permanent injunction is particularly improper. See *Silverstein*, 2003 WL 21361734 at *1 (denying stay of a fully-litigated permanent injunction).

**B.**

The company does not deny the harm it has done—and is doing—to Riverdale retirees. Rather, the company asks this Court for a stay to serve the company's financial self-interest.

The company asserts that meeting its healthcare obligations to the retirees will cost about $1.5 million a year. Another way of expressing the same point is that the company's failure to meet its healthcare obligations will cost *the retirees* about $1.5 million a year. The company is obligated to keep its promises *and*—as the district court held (R. 83, PgID#1198)—is in a far better financial position than are the retirees.

For perspective, consider the defendants: ITW "had $14.8 billion in revenue in 2018" from "operations in 55 countries that employ more than 48,000 women and men." www.itw.com/about-itw. Signode is a "$2.4 billion global company" with "7,000 employees" and "88 manufacturing facilities across six continents" making products "sold around the world in developed and emerging markets under well-known and trusted brand names, including: Acme Packaging." www.signodegroup.com/about-us.

The defendants—readily able to pay the cost of promised retiree healthcare—cannot justify a stay. See, *e.g.*, *Blum v. Caldwell*, 446 U.S. 1311, 1315–1316 (1980) (that defendant will "expend an additional $150 million per year in Medicaid benefits" does not justify a stay; company cost does not outweigh the harm to the "life and health" of "persons who are aged, blind, or disabled and unable to provide for necessary medical care because of lack of resources").

Here, the company has *already* avoided spending more than $5 million—in 2016, 2017, 2018, and the first half of 2019—because the company unilaterally cancelled the promised healthcare at the end of 2015—for fixed-income retirees who last worked before the plant closed 15 years ago. The company is not entitled to prolong the harm.

### C.

This Court's temporary stay—issued June 17, 2019 (Doc. 12)—directed the company to post a $1.5 million *supersedeas* bond or provide "other assurance that the full amount necessary to compensate the plaintiffs will be promptly paid if this court affirms the district court's judgment." The $1.5 million bond provides some welcome security for the retirees, but we believe more is needed *if* the stay remains.

**First**, as the cited authorities show, deprivation of retiree healthcare does irreparable injury which cannot be fully compensated by dollars, *e.g.*, "emotional distress," "deprivation of life's necessities," "extreme hardship," and "delay in or inability to obtain medical services."

**Second**, the retirees are subject to the immutable law of mortality. Their numbers have diminished since the company cancelled their healthcare in 2016. It is inevitable that their numbers will be further reduced in the months to come, making it likely that some of the retirees will *never* have a meaningful remedy—even with the bond.

**Third**, the $1.5 million bond is insufficient. In the company's estimation, healthcare for the retirees would cost about $125,000 monthly. The retirees have been without the promised company-paid healthcare since January 1, 2016—for 42 months (12 months each in 2016, 2017, and 2018 and another six months in 2019).

The company has already "saved"—and the retirees have already been deprived of $5.25 million to date. The company windfall—the retirees' financial hardship—multiplies by $125,000 for each new month of continued delay.

14

If the stay is to continue as the company asks, the bond should provide adequate security for the full amount of the company windfall, including $125,000 more for July 2019 and $125,000 for every month after that.

## V.　The Public Interest Favors Enforcement of Collectively-bargained Healthcare Promises and Retirees' ERISA Rights

ERISA's objective is to "protect" all "participants in employee benefit plans and their beneficiaries," including retirees, their families, and their surviving spouses.  29 U.S.C. §1001(b).

This public interest favors rigorous enforcement of the promised ERISA-regulated healthcare earned by each Riverdale retiree with decades of industrial labor.  "There is a strong public interest in preventing employers from discontinuing workers' health insurance coverage in violation of ERISA."  *Teamsters Local 120 v. Marathon*, 2006 WL 2971667 at *6 (D. Minn.).

The public interest, too, is embodied in the National Labor Relations Act, 29 U.S.C. §151 *et seq.*, which protects collectively bargaining rights, and in Section 301 of the Labor-Management Relations Act, 29 U.S.C. §185, which provides for the enforcement of collective bargaining agreement rights in federal courts.

Here, under ERISA and federal labor law, the public interest lies with rigorous enforcement of the company's obligations to the retirees.

## VI.　The Company Has "Unclean Hands"

The "unclean hands" doctrine "closes the door" to a party "tainted with inequitableness or bad faith relative to the matter."  *ABF Freight System v. NLRB*, 510 U.S. 317, 329–330 (1994).

Here, the stay request is tainted by company "unclean hands."  As detailed in the retirees' district court motions (R. 74-75; R. 80-81), the company has not "as soon as reasonably practicable" restored the "healthcare benefits that were in effect before January 1, 2016."  Indeed,

the contempt proceeding that began on June 10 addresses the company's now 89-day inadequate compliance with the district court orders.  (R. 84; R. 88).

## A.

In response to the retirees' first enforcement motion (R. 74-75)—and the district court's pointed encouragement at the May 8 hearing—the company proffered a May 13 "reinstatement timetable" (R. 81-2), portending further delay of healthcare reinstatement for six months or more—while the company engages in "data collection," "materials preparation," vendor quotes, "data entry & system testing," and other amorphous paper-shuffling.

In addition, the company plans self-interested *unilateral* changes—in the healthcare administrator and benefits—disregarding the *status quo ante*.  This makes more delay inevitable and will require more costly litigation for the retirees to enforce their ERISA and contract rights.

The *status quo ante* is well known (**1**) to the company—which provided the healthcare until 2016—and (**2**) to Blue Cross Blue Shield of Illinois ("BCBSI")—which administered Riverdale plant healthcare for decades before the company unilaterally ended it in 2016.  (R. 36-12).

All the pertinent data is known: retirees' birthdates, social security numbers, marital statuses, healthcare benefits, and monthly contributions.  BCBSI annually calculated retiree co-funding based on family and Medicare status (*e.g.*, single pensioner, single pensioner and spouse, Medicare-covered and non-Medicare covered).  Until the company unilaterally "pulled the plug," BCBSI provided a network of doctors, calculated costs and contributions, and administered the healthcare self-funded by the company.

BCBSI could have promptly restored the *status quo ante* healthcare as *required* by the March injunction—*if* the company had asked BCBSI to do so.  But, as company officials admitted at the June 10 contempt hearing, the company has *not* even contacted BCBSI.

16

**B.**

In March the company explicitly stipulated to preserving the retirees' *right to enforce* the injunction pending the company appeal.  (R. 65).  Three months later, the company reneges, asking this Court to eliminate this enforcement right.

An additional reason for denying the stay is this record demonstrating company "unclean hands" and "gamesmanship."  See *Arthur v. Allen*, 574 F.Supp.2d 1252, 1256 (S.D. Ala. 2008) (the stay-request timing suggests an "ambush, an exercise in eleventh-hour gamesmanship" and such "conduct is the very antithesis of equitable, diligent, good faith, vigilant conduct required of a litigant seeking equitable relief").

## CONCLUSION

By every pertinent measure—the explicit contract terms, federal precedent and industry practice, and decades of company admissions and performance—Pensioners' CBA ¶6 promises lifetime healthcare for the Riverdale retirees.

By every pertinent measure, the company cannot meet its "extraordinary" burden to justify the post-judgment stay denied by the district court.

We ask the Court to deny the company's stay motion and lift the temporary stay, clearing the way for the reinstatement of retiree healthcare as ordered by the district court last March.

Alternatively, if the Court continues the stay, the required bond should provide adequate security for the full amount of the company windfall. That windfall is $5.25 million through June 2019. It will increase by $125,000 for July 2019, and it will increase by another $125,000 for every month after that.

s/John G. Adam  
Stuart M. Israel (MI P15359)  
John G. Adam (MI P37205)  
Legghio & Israel, P.C.  
306 South Washington, Suite 600  
Royal Oak, MI 48067  
(248) 398-5900  
israel@legghioisrael.com  
jga@legghioisrael.com  

June 21, 2019                                    Attorneys for Plaintiffs-Appellees

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

This brief complies with the type-volume limitation of FRAP 32(a)(7)(B) because it contains 4,835 words using Microsoft Word for Office 360, Times New Roman, 12 point font, excluding the parts of the brief exempted by Rule FRAP 32(f).

s/John G. Adam
John G. Adam
Attorney for Plaintiffs-Appellees

**CERTIFICATE OF SERVICE**

I certify that on June 21, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of interest participating in the CM/ECF system.

s/John G. Adam
John G. Adam
Attorney for Plaintiffs-Appellees

**DESIGNATION OF DISTRICT COURT DOCUMENTS**

| Record Reference | Page ID range | Description |
|---|---|---|
| R1 | 1-17 | Complaint |
| R19 | 251-288 | Answer |
| R35 | 574-576 | Plaintiffs' Cross-Motion for Summary Judgment and Preliminary Injunction |
| R36 | 577-600 | Plaintiffs' Brief in Support of Cross-Motion for Summary Judgment and Preliminary Injunction |
| R36-1 | 601 | Exhibit list A-Q in support of plaintiffs' (1) cross-motion for summary judgment and permanent injunction and (2) in opposition to defendants' summary judgment motion |
| R36-2 | 602-606 | 1994 Pensioners' CBA (Ex. A) |
| R36-3 | 607-676 | 1994 Program of Insurance Benefits (Ex. B) |
| R36-4 | 677-708 | 2002 Labor Agreement (Ex. C) |
| R36-5 | 709-721 | 2002 Pensioners' CBA (Ex. D) |
| R36-6 | 722-737 | 2002 Acme motion for bankruptcy court approval of 2002 Labor Agreement and 2001 and 2002 Pensioners' CBAs (Ex. E) |
| R36-7 | 738-740 | 2002 bankruptcy court order approving 2002 Labor Agreement and 2001 and 2002 Pensioners' CBAs (Ex. F) |
| R36-8 | 741-746 | January 29, 2016 Signode letter to USW regarding retiree healthcare termination (Ex. G) |
| R36-9 | 747-756 | Signode 2014 annual report to DOL regarding welfare benefit plan (Ex. H) |
| R36-10 | 757-759 | September 1, 2015 Signode letter to retirees and surviving spouses regarding healthcare termination (Ex. I) |
| R36-11 | 760-761 | Undated Signode 2015 letter to USW regarding healthcare termination (Ex. J) |
| R36-12 | 762-763 | September 29, 2015 Signode letter to Blue Cross/Blue Shield of Illinois regarding healthcare termination (Ex. K) |
| R36-13 | 764-766 | February 22, 2016 USW letter to Signode protesting healthcare termination (Ex. L) |
| R36-14 | 767-769 | 2004 closing agreement (Ex. M) |
| R36-15 | 770-797 | Excerpts from answer to complaint (Ex. N) |
| R36-16 | 798-811 | Excerpts from defendants' discovery responses (Ex. O) |
| R36-17 | 812-817 | Declaration of Anthony M. Kuchta (Ex. P) |
| R36-18 | 818-820 | Declaration of Harold Stone (Ex. Q) |
| R37 | 821-830 | Plaintiffs' Statement of Material Facts in Support of Cross-Motion for Summary Judgment and Preliminary Injunction and in Opposition to Defendants' Motion for Summary Judgment |
| R38 | 831-857 | Plaintiffs' Response to Defendants' Statement of Material Facts |

| R43 | 888-906 | Plaintiffs' Reply to Motion for Summary Judgment and Permanent Injunction |
| R50 | 919-936 | Plaintiffs' Supplemental Brief |
| R50-4 | 947-948 | May 3, 2004 company email to USW (Ex. R) |
| R55 | 963-970 | Memorandum Opinion and Order; *Stone v. Signode and ITW*, 365 F.Supp.3d 957 (N.D. Ill. 2019) |
| R64 | 1042 | Permanent Injunction; *Stone v. Signode and ITW*, 2019 WL 1375159 (N.D. Ill. March 26, 2019) |
| R65 | 1043 | Order |
| R74 | 1096-1099 | Plaintiffs' emergency motion to enforce March 26, 2019 permanent injunction (R64) |
| R75 | 1110-1112 | Brief in support of Plaintiffs' emergency motion to enforce March 26, 2019 permanent injunction (R64) |
| R79 | 1141-1155 | Retirees' opposition to stay |
| R80 | 1160-1164 | Plaintiffs' renewed emergency motion to enforce the permanent injunction ordering defendants to restore *status quo ante* retiree healthcare (R64) |
| R81 | 1165-1167 | Brief in support of renewed emergency motion to enforce the permanent injunction ordering defendants to restore *status quo ante* retiree healthcare (R64) |
| R81-1 | 1168 | Exhibit list (Exs. A-D) |
| R81-2 | 1169-1171 | Company "Reinstatement Timetable," attached to company attorney's May 13, 2019 email (Ex. A) |
| R81-3 | 1172-1174 | May 13, 2019 retirees' attorney's email requesting information and documents regarding "Reinstatement Timetable" (Ex. B) |
| R81-4 | 1175-1179 | May 15, 2019 retirees' attorney's email requesting information and documents regarding "Reinstatement Timetable" and summarizing discussion (Ex. C) |
| R81-5 | 1180-1193 | BCBSI 2001 renewal report, attached to company attorney's May 16, 2019 email (Ex. D) |
| R83 | 1196-1198 | Order denying defendants' motion to stay the permanent injunction pending appeal; *Stone v. Signode and ITW*, 2019 2308038 (N.D. Ill. May 29, 2019) |
| ECF83 | n/a | Contempt hearing set for June 10, 2019 |
| R84 | 1199-1207 | May 29, 2019 status conference transcript |
| R88 | 1219 | Contempt hearing held June 10 and continued to June 24, 2019 |
| R90 | 1221-1385 | June 10, 2019 contempt hearing transcript |
| R92 | 1388 | June 20, 2019 order cancelling June 24 hearing pursuant to the Seventh Circuit stay |